IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

MARVIN DAVIS,                          )
      Plaintiff,                     )
           v.                   )      Civil No.  3:15cv007 (REP)
                      )
CAROLYN W. COLVIN,                     )
Acting Commissioner of Social Security, )
      Defendant.                     )
_____ )

## REPORT AND RECOMMENDATION

Marvin Davis ("Plaintiff") is forty years old and previously worked as a machine operator, a janitor, a cook and a laborer in manufacturing and landscape.  On February 28, 2012, Plaintiff applied for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"), alleging disability from blindness and difficulty standing with pins and rods in his left foot, with an alleged onset date of June 1, 2011.  Plaintiff's claims were denied both initially and upon reconsideration.  On August 19, 2013, Plaintiff (represented by counsel) appeared at a hearing before an Administrative Law Judge ("ALJ").  The ALJ subsequently denied Plaintiff's claims in a written decision on September 19, 2013.  On December 3, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner of Social Security.

Plaintiff now appeals the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in finding that Plaintiff is not legally blind and in concluding that there are jobs in the national economy that Plaintiff can perform given his actual visual limitation.  The parties have submitted cross-motions for summary judgment that are now ripe for review.  Having reviewed the entire record in this case, the Court is now prepared to issue a

Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).[1]  For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED, that Plaintiff's Motion for Remand (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.   BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, relevant medical records, state agency physicians' opinions, function report, hearing testimony and VE testimony are summarized below.

### A.  Education and Work History

Plaintiff completed the tenth grade. (R. at 255.)  Plaintiff previously worked as a machine operator, a janitor, a cook and a laborer in manufacturing and landscape. (R. at 255.)

### B.  Medical Records

On June 24, 2010, Plaintiff visited Nicholas Bixler, O.D.  (R. at 361.)  Dr. Bixler provided Plaintiff a pair of trial contact lenses.  (R. at 361.)  On July 7, 2010, Dr. Bixler prescribed contact lenses.  (R. at 361-62.)  Plaintiff's prescription expired on June 24, 2011, and he did not receive a new prescription.  (R. at 361-62.)

On October 13, 2011, Plaintiff presented at Southside Regional Medical Center.  (R. at 327-29.)  Plaintiff complained of general fatigue and testicular discomfort.  (R. at 327.)  An

---

[1]     The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiffs social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

ultrasound examination revealed mild hyporemia in his scrotum, likely resulting from epididymitis. (R. at 336.)

On January 13, 2012, Plaintiff visited Sharon Reilly, M.D. at Charlotte Primary Care. (R. at 340, 342.) Plaintiff complained that his vision continued to worsen. (R. at 340, 342.) Dr. Reilly noted that Plaintiff was unemployed, lived with his mother and continued to drive. (R. at 340, 342.) Plaintiff indicated that he previously visited two optometrists and that both doctors opined that he could no longer wear glasses. (R. at 340, 342.) Plaintiff previously tried contact lenses, but they did not improve his vision. (R. at 340, 342.) Plaintiff had never been to an ophthalmologist. (R. at 340, 342.) Dr. Reilly conducted a physical examination that revealed that Plaintiff had a visual acuity worse than 20/200. (R. at 340, 342.) Dr. Reilly assessed Plaintiff as legally blind and referred him to an ophthalmologist. (R. at 340, 342.)

On February 1, 2012, James Wills, M.D. examined a radiograph examination of Plaintiff's right ankle. (R. at 343-45.) Dr. Wills opined that Plaintiff's right ankle showed post-traumatic degenerative arthrosis. (R. at 344-45.)

On May 24, 2012, Plaintiff visited Joseph E. O'Boyle, M.D. at the Virginia Department of Rehabilitative Services. (R. at 348-49.) Plaintiff discussed his nearsightedness with gradual blurring of his distance vision. (R. at 348.) Plaintiff reported that neither glasses nor contact lenses improved his vision. (R. at 348.) Plaintiff denied any eye injuries, eye surgery, glaucoma, cataracts, laser treatment, retinal or corneal disease. (R. at 348.) Further, Plaintiff explained that several optometrists suggested that he undergo laser eye surgery, but that he had not pursued treatment. (R. at 348.) Dr. O'Boyle conducted a physical examination that revealed a visual acuity of 1/200 in his right eye and 3/200 in his left eye without the assistance of glasses or contact lenses. (R. at 349.) Dr. O'Boyle noted that Plaintiff's right eye vision improved to

20/100 with a manifest refraction of -9.75 plus 1.00 at 115 and his left eye vision improved to 20/80 minus 1 with a manifest refraction of -10.25 plus 2.50 at 055.  (R. at 349.)  Dr. O'Boyle observed that Plaintiff's cornea showed conical changes in both eyes and his corneal topography demonstrated steep inferior cones in both eyes.  (R. at 349.)  Dr. O'Boyle diagnosed Plaintiff with keratoconus and opined that Plaintiff also suffered irregular astigmatism that could not be corrected with glasses.  (R. at 349.)  Dr. O'Boyle noted that Plaintiff's vision may improve with contact lenses that could allow him to legally drive and may qualify for corneal transplants or corneal cross-linking to improve his vision.  (R. at 349.)

On February 7, 2013, Plaintiff visited Joseph Davis, FNP at Charlotte Primary Care.  (R. at 360.)  Plaintiff complained of sinus congestion, facial pain and dizziness.  (R. at 360.)  Plaintiff reported that he was mostly blind, but had scheduled an eye appointment.  (R. at 360.)

C.  State Agency Physicians

On June 12, 2012, J. Astruc, M.D., a state agency physician, reviewed Plaintiff's medical records and completed a Disability Determination Explanation.  (R. at 89-93.)  Dr. Astruc concluded that Plaintiff had the severe medically determinable impairments ("MDIs") of loss of visual acuity and osteoarthrosis.  (R. at 89.)  He opined that Plaintiff could perform light work.  (R. at 92.)  Dr. Astruc also found that Plaintiff could occasionally lift or carry approximately twenty pounds and frequently lift or carry ten pounds.  (R. at 90.)  Plaintiff could stand, walk or sit for approximately six hours in an eight-hour workday and push or pull without limitation.  (R. at 90.)  Dr. Astruc also found that Plaintiff had visual limitations.  (R. at 91.)  Specifically, Plaintiff had limited near and far acuity in both eyes, but had no depth perception, accommodation, color vision or field of vision limitations.  (R. at 91.)  Dr. Astruc assessed that Plaintiff had no postural, manipulative, communicative or environmental limitations.  (R. at 91.)

4

On July 19, 2012, Ralph Hellams, M.D., a state agency physician, reviewed Plaintiff's medical records. (R. at 109-13.) Dr. Hellams also concluded that Plaintiff had the severe MDIs of loss of visual acuity and osteoarthrosis. (R. at 109.) He determined that Plaintiff could perform light work. (R. at 112.) Dr. Hellams found that Plaintiff could occasionally lift or carry approximately twenty pounds and frequently lift or carry ten pounds. (R. at 110.) Plaintiff could stand, walk or sit for approximately six hours in an eight-hour workday and push or pull without limitation. (R. at 110.) Dr. Hellams further found that Plaintiff suffered visual limitations and had limited near and far acuity in both eyes, but had no limitations on his depth perception, accommodation, color vision or field of vision. (R. at 110.) Dr. Hellams assessed that Plaintiff had no postural, manipulative, communicative or environmental limitations. (R. at 110-11.)

D. Function Report

On March 27, 2012, Plaintiff completed a function report. (R. at 274-81.) He lived in a house with his family. (R. at 274.) His typical day involved bathing, dressing and cooking, with the assistance of his family. (R. at 274.) Plaintiff indicated that his condition affected his sleep. (R. at 275.) Plaintiff had no problem bathing, feeding himself or using the toilet, but noted that he could not read the names of soap or see the colors of his clothes. (R. at 275.) He needed no special reminders to take care of his personal needs or grooming or to take his medication. (R. at 276.)

Plaintiff sometimes prepared his own meals, but did not use the stove. (R. at 276.) Plaintiff indicated that his family members completed house and yard work, because he could not see. (R. at 276.) Plaintiff went outside every other day. (R. at 277.) When he went out, he rode in a car. (R. at 277.) Plaintiff could not drive because of his vision and indicated that he needed someone to accompany him when he went out. (R. at 277.) He could buy groceries in

stores, but noted that his mother helped shop for food and clothes. (R. at 277.) Plaintiff stated that he retained the sense to pay bills, count change, handle a savings account and use a checkbook or money order, but he no longer could do so because he often made errors as a result of his deteriorated vision. (R. at 277.)

Plaintiff's hobbies included reading and watching television, but he stated that he no longer had the vision to see. (R. at 278.) Plaintiff reported that he spent time with others daily. (R. at 278.) He had never been fired from a job because of problems getting along with others. (R. at 280.) Plaintiff did not need reminders to go places, but needed someone to accompany him. (R. at 278.) Plaintiff finished what he started. (R. at 279.) Plaintiff could follow spoken instructions, but could not follow written instructions because of his vision. (R. at 279.) Plaintiff handled stress and changes in routine as an average individual could do and experienced no unusual behaviors or fears. (R. at 280.) His condition affected his ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, see, complete tasks and follow instructions. (R. at 279.) Plaintiff could only walk a little before he experienced pain and required at least three hours of rest. (R. at 279.)

E.  Plaintiff's Testimony

On August 19, 2013, Plaintiff (represented by counsel) testified during the hearing before the ALJ. (R. at 50-77.) Plaintiff was forty-one years old. (R. at 55.) Plaintiff completed the tenth grade and previously worked as a machine operator, a cook and a laborer in landscape and manufacturing. (R. at 58, 60-64.) Plaintiff stopped driving towards the end of 2012. (R. at 57.) He relied on others to drive him and stated that he probably could use public transportation, but may still need assistance because his vision had worsened. (R. at 57.)

6

Plaintiff testified that his eyesight deteriorated so severely that glasses and contact lenses no longer helped. (R. at 65.) The ALJ noted that there are no medical records of Plaintiff's recent contacts prescriptions, but Plaintiff testified that he tried them approximately one year earlier. (R. at 66.) Plaintiff stated that he only visited his family health physician on a regular basis and did not take daily medications. (R. at 66.) Plaintiff discussed his ankle pain and stated that he could barely walk for days. (R. at 66.)

Plaintiff testified that since the onset of his alleged disability, a typical day included staying at his house unless someone took him somewhere. (R. at 67.) During the day, Plaintiff could make lunch or clean, but his ankle continued to hurt every day. (R. at 67-68.) He indicated that rest and over-the-counter medication helped improve his ankle pain. (R. at 69.) Plaintiff also testified that he could walk "anywhere" for a fair distance, but it hurt. (R. at 69.) Plaintiff indicated that he could lift approximately fifty to sixty pounds or slightly more. (R. at 59, 69.) He could pick up his five-year-old son who weighed approximately forty pounds. (R. at 70.) Plaintiff testified that he had no problems using his hands, reaching, grabbing objects, or getting into and out of chairs. (R. at 70). He also had no problems sometimes kneeling, crouching and crawling, but noted that this pressured his ankle. (R. at 70.) His condition did not affect his sleep unless he was tired during the day and napped. (R. at 70-71.)

Plaintiff testified that he had no problems with self-care and could shower, dress and shave on his own. (R. at 71.) Plaintiff testified that he walked or carried his son and watched television with him, but he could not play catch or read with his son because of his poor vision. (R. at 72.) Plaintiff stated that he shopped for groceries, but needed assistance because he could not read labels. (R. at 73.) He attended church every Saturday. (R. at 73.) Plaintiff did not use a computer for approximately two years because of his vision. (R. at 73.)

Plaintiff testified that previous doctors discussed laser eye surgery, but he did not think that he qualified for the surgery. (R. at 75.) Plaintiff also stated that he tried glasses and contact lenses and neither helped his vision, but sometimes made it brighter. (R. at 76.) He indicated that his vision worsened in closed areas. (R. at 75.)

F.  Vocational Expert Testimony

During the August 19, 2013 hearing, a VE also testified. (R. at 77-82.) The ALJ asked the VE if a hypothetical person of the same age, education and work experience as Plaintiff, who could perform light work with the limitations that he could frequently balance, crouch or stoop, occasionally climb stairs and ramps, kneel and crawl, but could never climb ladders, ropes or scaffolds and could only occasionally be exposed to workplace hazards such as dangerous moving machinery, could never be exposed to unprotected heights and with no distance vision or near visual acuity for objects smaller than the size of a quarter could perform work in the national economy. (R. at 79-80.) The VE stated that such a person could perform work in the national economy. (R. at 80.) The VE explained that such an individual could work at the unskilled, light exertion level, including as a housekeeper with 136,000 jobs nationally and 3,700 jobs in Virginia, as a car wash attendant with 60,000 jobs nationally and 1,300 jobs in Virginia, and as a cafeteria attendant with 81,000 jobs nationally and 1,500 jobs in Virginia. (R. at 80.)

Next, the ALJ asked the VE whether, assuming everything in the first hypothetical, an individual who could see no more than five feet could perform work in the national economy. (R. at 80.) The VE explained that there would not be competitive employment for such an individual. (R. at 81.)

## II.    PROCEDURAL HISTORY

On February 28, 2012, Plaintiff filed for DIB and SSI due to blindness and right foot pain with an alleged onset date of June 1, 2011. (R. at 34, 192-207, 254.)  Plaintiff's claim was denied both initially and upon reconsideration. (R. at 123-32, 135-40.)  On August 19, 2013, Plaintiff (represented by counsel) testified before the ALJ during a hearing. (R. at 50-77.)  On September 19, 2013, the ALJ issued a written decision denying Plaintiff's claims. (R. at 34-43.)  On December 3, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1.)

## III.    QUESTIONS PRESENTED

1.  Did the ALJ err in finding that Plaintiff is not legally blind?

2.  Did the ALJ err in finding that there are jobs in the national economy that Plaintiff can perform given Plaintiff's actual visual acuity?

## IV.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

9

(quoting *Johnson*, 434 F.3d at 653).  In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477.  If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000).  An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b).  SGA is work that is both substantial and gainful as defined by the Agency in the Code of Federal Regulations.  Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a).  Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R.

10

§ 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to his past relevant work[2] based on an assessment of the claimant's RFC[3] and the "physical and mental demands of work [the claimant] has done in

---

[2]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[3]     RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472. However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

## V.     ANALYSIS

A. The ALJ's Decision.

On August 19, 2013, Plaintiff (represented by counsel) testified during a hearing before the ALJ. (R. at 50-77.) An impartial VE also testified during the hearing. (R. at 77-82.) On September 19, 2013, the ALJ issued a written opinion, determining that Plaintiff was not

disabled under the Act.  (R. at 31-33.)  The ALJ followed the five-step sequential evaluation process as established by the Act when analyzing whether Plaintiff was disabled.  (R. at 34-43.)

At step one, the ALJ determined that Plaintiff had not engaged in SGA since his alleged onset date of disability on June 1, 2011.  (R. at 36.)  At step two, the ALJ determined that Plaintiff had the severe impairments of irregular astigmatism with decreased visual acuity (high anistropria with keratoconus), post-traumatic degenerative arthrosis of the left ankle and obesity. (R. at 36.)  At step three, the ALJ determined that Plaintiff's impairments or combination of impairments did not meet the severity of one of the listed impairments in 20 C.F.R. Part 44, Subpart P, Appendix 1.  (R. at 37.)

Before moving onto step four, the ALJ determined that Plaintiff had the RFC to perform a range of light work with limitations.  (R. at 38.)  Specifically, the ALJ determined that Plaintiff could frequently balance, stoop and crouch, could occasionally climb stairs and ramps, kneel and crawl, but could never climb ladders, ropes or scaffolds, and could occasionally be exposed to workplace hazards such as dangerous moving machinery, but could never be exposed to unprotected heights, and with no distance vision of twenty feet or near visual acuity for objects smaller than a quarter required to complete tasks.  (R. at 38.)  At step four, the ALJ found that Plaintiff could not perform his past relevant work.  (R. at 41.)  Finally, at step five, the ALJ concluded that based upon Plaintiff's age, education, work experience and RFC, jobs existed in the national economy in significant numbers that Plaintiff could perform.  (R. at 41-42.) Accordingly, the ALJ determined that Plaintiff was not disabled under the Act.  (R. at 42.)

Plaintiff challenges the ALJ's decision on two grounds.  First, Plaintiff argues that the ALJ erred in finding that Plaintiff's condition failed to meet listing § 2.02.  (Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 14) at 11-12.)  Second, Plaintiff

contends that the ALJ erred in posing the hypothetical to the VE. (Pl.'s Mem. at 13.) Defendant argues that substantial evidence supports the ALJ's decision with respect to each challenge. (Def.'s Mot. for Summ. J. and Br. In Supp. Thereof ("Def.'s Mem.") (ECF No. 15) at 10-14.)

B. The ALJ did not err in determining that Plaintiff is not legally blind.

Plaintiff argues that the ALJ erred in failing to finding that Plaintiff was legally blind. (Pl.'s Mem. at 11-12.) Defendant responds that substantial evidence supports the ALJ's decision. (Def.'s Mem. at 10-13.)

Plaintiff's argument is based on 20 C.F.R. § 404.1581, which provides that "[s]tatutory blindness is defined in the law as central visual acuity of 20/200 or less in the better eye with the use of correcting lens." 20 C.F.R. § 404.1581. In determining that Plaintiff was not statutorily blind, the ALJ evaluated Plaintiff's visual impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. The Act "defines blindness as central visual acuity of 20/200 or less in the better eye with the use of a correcting lens . . . [Plaintiff has] statutory blindness only if your visual disorder meets the criteria of 2.02 or 2.03A." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The regulations consider a claimant to have lost central visual acuity when "[r]emaining vision in the better eye after best correction is 20/200 or less." *Id.* Based on this standard, the ALJ found that "the evidence in the record does not establish visual acuity of 20/200 or less in the better eye (after correction)." (R. at 37.) Even though Plaintiff's argument that the ALJ erred rests on a different section of the Code of Federal Regulations, the Court will review the ALJ's decision under step three of the five-step sequential analysis, as both 20 C.F.R. § 404.1581 and Subsection 2.02 of 20 C.F.R. Part 404, Subpart P, Appendix 1 provide for the same threshold for legal blindness.

Plaintiff bears the burden of proving that he meets or equals a listing. *Yuckert*, 482 U.S. at 146 n.5. The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require an exacting standard of proof. *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990.) "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

To meet listing § 2.02, Plaintiff's condition must satisfy all of the listing's enumerated criteria. *Zebley*, 493 U.S. at 350. Specifically, the listings define blindness as "central visual of 20/200 or less in the better eye with the use of a correcting lens." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 2.02. Further, "[a]n eye which is accompanied by a limitation in the fields of vision such that the widest diameter of the visual field subtends an angle no greater than 20 degrees shall be considered for purposes of this paragraph as having a central visual acuity of 20/200 or less." *Id.*

In this case, the ALJ found that Plaintiff had the severe impairments of irregular astigmatism with decreased visual acuity, high anistropria with keratoconus, post-traumatic degenerative arthrosis of the left ankle and obesity. (R. at 36.) The ALJ found that Plaintiff's condition did not meet listing § 2.02. (R. at 37.) The ALJ determined that the medical evidence did not establish that Plaintiff suffered visual acuity of 20/200 or less in his better eye after correction. (R. at 37.)

Substantial evidence supports the ALJ's determination. In January 2012, Plaintiff complained of worsening vision, but he continued to drive. (R. at 340, 342.) Plaintiff previously visited two optometrists and both opined that he could no longer wear glasses. (R. at 340, 342.) Plaintiff indicated that contact lenses did not improve his vision. (R. at 340, 342.) Dr. Reilly

noted that Plaintiff had never been referred to an ophthalmologist. (R. at 340, 342.) Dr. Reilly

conducted a physical examination and assessed Plaintiff as legally blind and referred him to an

ophthalmologist. (R. at 340, 342.) No medical records indicate that Plaintiff followed-up with

Dr. Reilly's referral.

Dr. O'Boyle's notes further establish that Plaintiff does not suffer visual acuity of 20/200

or less in his better eye after correction. On May 24, 2012, Plaintiff discussed with Dr. O'Boyle

that several optometrists suggested that he undergo laser eye surgery, but Plaintiff had not

pursued any further treatment. (R. at 349.) Importantly, Dr. O'Boyle noted that Plaintiff's best

corrected vision improved to 20/100 in his right eye and 20/80 minus 1 in his left eye. (R. at

349.) Dr. O'Boyle diagnosed Plaintiff with keratoconus and irregular astigmatism. (R. at 349.)

Dr. O'Boyle noted that Plaintiff's vision was not correctable with glasses, however, it could

improve with contact lenses that could allow him to legally drive. (R. at 349.) Further, Plaintiff

may qualify for corneal transplants or corneal cross-linking to improve his vision. (R. at 349.)

On February 7, 2013, Plaintiff reported to Dr. Davis that he was mostly blind, but that he had

finally scheduled an eye appointment. (R. at 360.)

State agency physicians' opinions also support the ALJ's conclusion. On June 12, 2012,

Dr. Astruc assessed that Plaintiff could perform light work, occasionally lift or carry

approximately twenty pounds and frequently lift or carry ten pounds, could stand, walk or sit for

approximately six hours in an eight-hour workday and push or pull without limitation. (R. at

90.) However, Dr. Astruc found that Plaintiff suffered visual impairments that limited near and

far acuity in both his eyes, but Plaintiff had no limitations on his depth perception,

accommodation, color vision or field of vision. (R. at 91.) Plaintiff also had no postural,

manipulative, communicative or environmental limitations. (R. at 91.) On July 19, 2012, Dr.

16

Hellams agreed that Plaintiff could perform light work. (R. at 110, 112.) Plaintiff had visual limitations and had limited near and far acuity in both eyes, but had no limitations on his depth perception, accommodation, color vision or field of vision. (R. at 110, 112.)

Plaintiff's own statements and documents support the ALJ's determination. On March 19, 2012, Plaintiff presented to the Social Security field office to complete his disability report. (R. at 249-52.) The interviewer observed that Plaintiff arrived with family and he had no problems reading, walking, concentrating, sitting, standing, seeing, using his hands or writing. (R. at 251.) On March 27, 2012, Plaintiff completed a function report and reported that he cared for his son, tended to his personal care needs independently, prepared meals, socialized with others and could run errands with assistance. (R. at 275-78.)

On August 19, 2013, Plaintiff (represented by counsel) testified that his eyesight deteriorated, but he cleaned, prepared meals and had no problems with self-care, including showering, dressing and shaving. (R. at 68, 71.) Plaintiff further testified that he walked, cared for his son and shopped for groceries with some assistance. (R. at 72-73.) Plaintiff noted that previous doctors discussed laser eye surgery, but he did not pursue the recommended treatment. (R. at 75.) Further, the ALJ specifically noted that although Plaintiff alleged disabling impairments, he had no surgeries and failed to follow-up on recommendations and referrals by treating physicians, suggesting that his symptoms were not as serious as he alleged. (R. at 40, 340, 348-49.) Because the evidence relied upon by Plaintiff and considered by the ALJ does not demonstrate that Plaintiff suffered visual acuity of 20/200 or less in his better eye after correction, the ALJ did not err in finding that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in § 2.02. Therefore, the ALJ did not err in finding that Plaintiff is not legally blind.

C. The ALJ was correct in concluding that there are other jobs that Plaintiff can perform in the national economy, because the ALJ properly assessed Plaintiff's RFC and incorporated it into the hypothetical to the VE.

Plaintiff argues that the ALJ erred in concluding that there are jobs in the national economy that Plaintiff can perform, because Plaintiff was legally blind and the VE testified that a person with limited acuity of five feet was not employable. (Pl.'s Mem. at 12-13.) Defendant responds that substantial evidence supports the ALJ's decision, because the ALJ's hypothetical question accurately portrayed all of Plaintiff's limitations, including his vision limitation of twenty feet. (Def.'s Mem. at 13-14.)

1. The ALJ did not err in limiting Plaintiff's distance vision to twenty feet in her RFC assessment.

Plaintiff argues that the ALJ erred in concluding that Plaintiff can see more than five feet in distance. (Pl.'s Mem. at 13.) Defendant maintains that the ALJ correctly concluded that Plaintiff's vision limitation is twenty feet after fully considering the medical evidence in the RFC assessment. (Def.'s Mem. at 13.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.902(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of the claimant's physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 416.945(b). Generally, the claimant is responsible for providing the evidence that the ALJ utilizes in making her RFC determination; however, before determining that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 416.945(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record, as well as those impairments that are

18

based on the claimant's credible complaints. *Carter v. Astrue*, 2011 WL 2688975, at *3 (E.D.

Va. June 23, 2011); *accord* 20 C.F.R. § 416.945(e).

In this case, the ALJ found that Plaintiff has the RFC to perform a range of light work,

with certain limitations including a distance vision limitation of twenty feet. Substantial

evidence supports the ALJ's determination.

As the ALJ explained in her opinion, the record does not establish visual acuity of 20/200

or less in the better eye. (R. at 37.) On May 24, 2012, Dr. O'Boyle, the only ophthalmologist in

the record who examined Plaintiff, noted that Plaintiff's right eye vision improved to 20/100

with a manifest refraction of -9.75 plus 1.00 at 115 and his left eye vision improved to 20/80

minus 1 with a manifest refraction of -10.25 plus 2.50 at 055. (R. at 349.) Although Dr.

O'Boyle opined that Plaintiff's irregular astigmatism could not be corrected with glasses, he

noted that Plaintiff's vision may improve with contact lenses, possibly to legal driving vision.

(R. at 349.) On February 12, 2013, Mr. Davis, a family nurse practitioner, noted that Plaintiff

was "mostly blind," such finding was purely based on Plaintiff's subjective complaints. (R. at

360.) Therefore, substantial evidence supports the ALJ's conclusion that the record does not

establish visual acuity of 20/200 or less, and consequently her decision to limit Plaintiff's

distance vision to twenty feet.[4]

---

[4]      20/20 vision is a term used to express normal visual acuity (the clarity or sharpness of
vision) measured at a distance of twenty feet. *Visual Acuity: What is 20/20 Vision?*, AMERICAN
OPTOMETRIC ASSOCIATION, http://www.aoa.org/patients-and-public/eye-and-vision-
problems/glossary-of-eye-and-vision-conditions/visual-acuity?sso=y (last visited Oct. 13, 2015).
If a person has 20/20 vision, he can see clearly at twenty feet what should normally be seen at
that distance. *Id.* If a person have 20/200 vision, he must be as close as twenty feet to see what
another person with normal vision can see at 200 feet. *See id.* By limiting Plaintiff's distance
vision to twenty feet, the ALJ recognized that Plaintiff does not have clarity of vision from more
than twenty feet, and therefore, his job should not involve seeing objects at more than twenty feet
away.

2.  The ALJ properly incorporated Plaintiff's RFC into the hypothetical to the VE.

During a hearing on August 19, 2013, the ALJ posed several hypotheticals to the VE. The ALJ first asked the VE to assume that an individual can perform all functions of light work, except that the individual is limited to occasional stairs and ramps; no ladders, ropes or scaffolds; frequent balancing and stooping; occasional kneeling; frequent crouching; and occasional crawling. (R. at 79.) The ALJ asked the VE to further assume that the individual could have occasional exposure to workplace hazards such as dangerous moving machinery, but could not have any exposure to unprotected heights. (R. at 79.) The individual can have no distance vision or near visual acuity. (R. at 79.) The ALJ clarified that the Dictionary of Occupational Titles defines distance vision as twenty feet. (R. at 80.) The ALJ then asked if jobs existed for such a hypothetical person. (R. at 80.) The ALJ responded that the person could work as a housekeeper, with approximately 136,000 positions nationally and 3,700 positions in Virginia; a car wash attendant, with approximately 60,000 positions nationally and 1,300 positions in Virginia; and as a cafeteria attendant, with approximately 81,000 positions nationally and 1,500 in Virginia. (R. at 80.) The ALJ limited the hypothetical person's distance vision to five feet, with other impairments remaining the same. (R. at 80.) When the ALJ asked if the person could perform the previously identified jobs, the VE responded that the person could not. (R. at 81.)

Plaintiff mischaracterizes the VE's testimony when he states that the VE "testified that such a person could perform no work that is available in substantial numbers in the national or local economy." (Pl.'s Mem. at 13.) The VE testified that there are jobs that Plaintiff could perform when the ALJ posed the first hypothetical question, properly incorporating Plaintiff's RFC. (R. at 80.) The ALJ had concluded that Plaintiff is not legally blind, which means his vision is not less than 20/200, and she incorporated the distance vision limitation to twenty feet

into the hypothetical question to the VE. The VE responded that Plaintiff could perform jobs as a housekeeper, a car wash attendant and a cafeteria attendant, and that a significant number of these jobs existed in the national economy. Therefore, the ALJ was entitled to rely on the VE's testimony and did not err in finding that, based on Plaintiff's RFC, he can perform a significant number of jobs in the national economy.

## VI.    CONCLUSION

For the reasons stated above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED, Plaintiff's Motion for Remand (ECF No. 13) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable Robert E. Payne with notification to all counsel of record.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: October 13, 2015

21